UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CYNTHIA KRUKOWSKI,           )
                                   )
        Plaintiff,        )
                                   )
                                       Case No. 10 CV 5282
                                 )
OMICRON TECHNOLOGIES, INC.     )
MARILYN G. RABB FOUNDATION,    )    Magistrate Judge
and LIOEL RABB                )    Arlander Keys
                                 )
        Defendants.      )
                                 )

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff, Cynthia Krukowski ("Ms. Krukowski"), filed suit against Defendants, Omicron Technologies, Inc. ("Omicron"), the Marilyn G. Rabb Foundation ("MGR"), and Lionel Rabb ("Mr. Rabb") (collectively, the "Defendants"), alleging sex discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, violations of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and breach of contract. Currently before the Court is Defendants' joint motion for summary judgment on all counts of Ms. Krukowski's Third Amended Complaint (the "Complaint"). For the reasons set forth below, Defendants' motion for summary judgment is granted in part and denied in part.

1

<u>BACKGROUND</u>

In June of 2009, Ms. Krukowski began working for Omicron, a consulting firm based in Chicago, Illinois that specializes in developing software packages used in the student information industry and in educational organizations. *See* Defendants' Statement of Undisputed Material Facts ("Defs.' Statement") at ¶1[1]; http://www.omicrontech.net/About. Acting as a Senior Project Manager, Ms. Krukowski alleges that she performed job duties for both Omicron and MGR, a non-profit organization dedicated to creating programs for youth in the Chicago area. *See* http://www.omicrontech.net/MGRF. According to Ms. Krukowski's Complaint, Omicron and MGR are indistinguishable entities, with Defendant, Mr. Rabb, serving as MGR's founder and as Omicron's president. However, Defendants deny that MGR and Omicron are the same entity or that they meet the minimum employee threshold for Title VII jurisdiction as alleged in the Complaint.

On July 23, 2009, Ms. Krukowski and Omicron memorialized their employment relationship by entering into an Amended and Restated Employment Agreement ("the Agreement"). Defs.' Statement at ¶9. While working for Omicron, Ms. Krukowski was deemed an "at-will" employee, subject to termination without any

---

[1] Unless otherwise noted, all citations to Defendants' Statement of Undisputed Facts refer to facts that have been admitted by Plaintiff.

cause or reason at any time with written notice, and the Agreement contained a separate provision governing the terms of termination. *Id.* at ¶11. Additionally, the Agreement contained an "entire agreement" provision which stated that the Agreement superseded any and all prior agreements concerning the same subject matter. *Id.* at ¶12. The Agreement was not modified in any way after being signed on July 23, 2009. *Id.* at ¶13.

In addition to the terms of employment, compensation, and other job-related rights and obligations, the Agreement guaranteed that Ms. Krukowski would be able to participate in any health insurance plan maintained by Omicron on the same basis as other Omicron employees as follows:

> Employee shall be eligible to participate in any employee benefit plans, medical insurance plans, life insurance plans, disability income plans, retirement plans, expense reimbursement plans and other benefit plans or programs made available to other employees of Employer as long as they are kept in force by Employer and provided that Employee meets all eligibility requirements and other terms, conditions and restrictions of such plans and programs.

Omicron provided Ms. Krukowski with health insurance under a group policy written by Aetna Health of Illinois Inc. ("Aetna") which became effective August 1, 2009. Defs.' Statement at ¶49. Ms. Krukowski alleges that her coverage was cancelled on October 31, 2009, and that Omicron then transferred most of its employees

covered by the Aetna plan to another health insurance plan held by MGR in December. On December 15, 2009, Ms. Krukowski underwent emergency room medical treatment at Northwestern Memorial Hospital, incurring charges just over $10,000. However, she was told by the hospital's admission department that her medical insurance – which she alleges was the now-cancelled Aetna plan – was no longer valid. On December 15, 2009, Omicron had a health insurance plan with Aetna ("the Plan"), but Aetna initially refused coverage for Ms. Krukowski's December 2009 Northwestern treatment. *Id.* at ¶51.

Ms. Krukowski alleges that she contacted Mr. Rabb, who told her that she was covered by medical insurance and that she should receive the medical treatment she needed. Ms. Krukowski did so, only to learn later that she was not covered by any medical insurance by her employer at the time of her treatment. As a result, she incurred $10,000 in medical bills that were not covered by insurance.

Omicron had at least four checks to Aetna returned for non-sufficient funds prior to November of 2009. *See* Plaintiff's Statement of Additional Undisputed Material Facts ("Pl.'s Statement") at ¶8[2]. After failing to pay numerous premium

---

[2] Unless otherwise noted, all citations to Plaintiff's Statement of Additional Undisputed Material Facts refer to facts that have been admitted by Defendants.

payments to Aetna, Omicron's insurance Plan was transferred to
James Dinh from Aetna Premium Collections in November 2009. *Id*.
at ¶9. Omicron received correspondence from Aetna dated October
22, 2009 that Defendants' check in the amount of $7,956.40 was
returned by Omicron's bank. *Id*. at ¶10. By November 1, 2009,
Omicron owed Aetna $27,909.80 in past due premiums for October
through November. *Id*. at ¶11. Mr. Rabb acknowledged and agreed
to a November 4, 2009 payment plan with Aetna when he signed the
November 4, 2009 letter from Aetna and returned it to Aetna. *Id*.
at ¶12. On December 21, 2009, Omicron sent Aetna a check for the
Plan's outstanding balance, but this check was returned because
Omicron's checking account was frozen/blocked. *Id*. at ¶13. At
his deposition, Mr. Rabb testified to not confirming whether
there were sufficient funds in Omicron's account before drafting
these checks to Aetna. *See* Rabb Dep. at p.217, line 20-24; p.
218, lines 1-2.

Aetna never informed Plaintiff that Mr. Raab had
unilaterally terminated or cancelled the Plan. Defs.' Statement
at ¶52. On January 6, 2010, Aetna sent a payment default letter
to Omicron indicating that health insurance coverage had been
retroactively terminated back to October 31, 2009. *Id*. at ¶53.
Between November 4, 2009 and January 6, 2010, Mr. Dinh sent no
letters to Omicron or Mr. Rabb. *Id*. at ¶54. After the Plan was

5

terminated on January 6, 2010, however, Omicron's employees were told that, in order to obtain insurance through Aetna for 2010, to back date applications to December 30, 2009 so that they could have insurance by February 1, 2010. Pl.'s Statement at ¶18. The employees were instructed not to fill out the top portion of page one of the applications which thereafter stated these employees were MGRF employees. *Id*. at ¶19.

Plaintiff's Title VII claim revolves around a bid made to the Louisiana Department of Education (the "RFP" bid). In the summer of 2009, Mr. Rabb brought the concept of submitting a bid response to the Department, and it was Ms. Krukowski's duty as project manager to make sure the bid was put together and structured in the right format. *Id*. at ¶¶15-16. Specifically, Plaintiff was to make sure that the cover letter, the table of contents, previous work, previous clients, and references were all in the bid, as well as to make sure that the technical portions followed the guidelines for structure and formatting. Additionally, Plaintiff had a role in formulating the project management costs for the RFP, and she was to provide project management costs and business costs for the RFP. *Id*. at ¶¶17-18. Conversely, Mr. Bhagat, was responsible for the technical aspects of the RFP, for answering all the technical questions, and coming

up with the "technical piece" of the RFP. *Id*. at ¶19. The RFP was valued at $2,700,000 by Omicron. Defs.' Statement at ¶20.

On January 19, 2010, Mr. Rabb told Ms. Krukowski that Omicron had come in last place on the RFP, and that prior to the RFP, Omicron had never scored last on a bid response. *Id*. at ¶¶21,29. On January 20, 2010, Mr. Rabb directed the Plaintiff to take some time off to think about her future with Omicron, as the failed RFP had damaged her trajectory within the company. During the meeting, Mr. Rabb did not mention Plaintiff's gender or Mr. Bhagat's gender. *Id*. at ¶46.

On Friday, January 22, 2010, Ms. Krukowski was orally terminated from her project management position with Omicron during an in-person meeting with Mr. Rabb. She received an email confirmation of her termination on Monday, January 25, 2010. Defs.' Statement at ¶¶34-35. Plaintiff performed no further work after receiving the termination email. *Id*. at ¶36.

During Plaintiff's tenure at Omicron, Mr. Rabb was the "ultimate decision-maker" on all matters. Defs.' Statement at ¶33. Mr. Rabb testified at his deposition that Plaintiff was terminated due to her poor work performance on the bid response to the Louisiana Department of Education, and because Omicron could not afford to pay her after that RFP failed. *See* Rabb Dep. at p.373, lines 16-24; lines 1-11, and at p. 375. Plaintiff's

position with Omicron has not been replaced since her
termination, and in 2010, Nora Kerr, a female employee for
Omicron, became the second highest-paid employee behind Ms.
Krukowski. *Id.* at ¶¶47-48.

### Standard of Review

Summary judgment is properly granted when "the pleadings,
depositions, answers to interrogatories, and admissions on file,
together with the affidavits, if any, show that there is no
genuine issue as to any material fact and the moving party is
entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c);
*Celotex Corp. v. Cartrett*, 477 U.S. 317, 322 (1986). Thus, to
avoid summary judgment, the plaintiff must submit specific,
competent evidence establishing a genuine issue of material fact
that a reasonable jury could resolve in their favor. *Matsushita
Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).
Summary judgment is appropriate when a party "fails to make a
showing sufficient to establish the existence of an element
essential to that party's case, and in which the party will bear
the burden of proof at trial." Celotex, 477 U.S. at 322. "[A]
complete failure of proof concerning an essential element of the
nonmoving party's case necessarily renders all other facts
immaterial." Id. at 323. A genuine issue as to any material
fact only exists when "the evidence is such that a reasonable

8

jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

<u>Analysis</u>

Defendants argue that Ms. Krukowski has failed to produce sufficient evidence to show that there is a genuine issue of material fact as to any essential elements of her claims. Regarding the Title VII claim, Defendants assert that it was the loss of a million-dollar contract, not gender, which led to Plaintiff's termination, and that Plaintiff cannot make out a prima facie case otherwise. Regarding Plaintiff's state law breach of contract claim for benefits, Defendants contend that it is preempted by ERISA, that the ERISA plan was in effect when Plaintiff received medical treatment, and that Plaintiff has already brought, and settled, an ERISA claim against Aetna Health of Illinois, Inc. ("Aetna"), the plan issuer, for $10,000. Finally, Defendants argue that Plaintiff's entire ERISA action fails as a matter of law, that no fiduciary duty claim can be alleged because she has already been monetarily compensated for it by Aetna, and she cannot also now recover from Defendants under ERISA, as well. The Court will address each claim in turn.


**I. Title VII Claim**

In order to establish a *prima facie* case of gender-based discrimination under Title VII, Ms. Krukowski must show that: (1) she is a member of a protected class; (2) she was meeting her employer's legitimate expectations; (3) she suffered an adverse employment action; and (4) other similarly-situated employees who were not members of the class were treated more favorably. *See McDonnell Douglas v. Green*, 411 U.S. 792, (1973); *Wells v. Unisource Worldwide, Inc.,* 289 F.3d 1001, 1006 (7th Cir. 2002). If she establishes a *prima facie* case, the burden then shifts to the Defendants to provide a legitimate non-discriminatory reason for the action. *Id.* If the Defendants meet that burden, the burden then shifts back to the Plaintiff to show "that there is an issue of material fact as to whether the employer's proffered reasons are merely pretext for unlawful discrimination ..., in order to survive summary judgment." *Id.* (quoting *Hudson v. Chicago Transit Authority*, 375 F.3d 552, 561 (7th Cir.2004)). Nonetheless, the ultimate burden of proof remains with Ms. Krukowski at all times. *See, e.g., Kirk v. Federal Property Management Corp.*, 22 F.3d 135, 138 (7th Cir.1994).

While Ms. Krukowski is female and was terminated by Omicron, the Court finds that she has failed to adduce sufficient evidence to create a genuine issue of material fact as to the remaining elements of a *prima facie* Title VII claim, nor has she overcome

her burden to prove an issue of material fact as to whether the Defendants' proffered reasons are merely pretext for unlawful discrimination.

First, the deposition testimony of both Ms. Krukowski and Mr. Rabb, the undisputed "Omicron decision-maker", demonstrates that the Plaintiff was not meeting Omicron's business expectations at the time of her termination.  Although this fact is undisputed by Plaintiff, she argues that, because she was never disciplined prior to the failed RFP and because there was no formal system of performance reviews, an issue of fact regarding her termination is viable.  (Pl.'s Resp. at p. 40.) This argument has no legal basis and misses the point of the second criterion of a Title VII claim.  The proper inquiry for determining whether a plaintiff is meeting business expectations is through the eyes of her supervisor at the time of her termination.  *See Gates v. Caterpillar, Inc.*, 513 F.3d 680 (7th Cir. 2008), *citing e.g., Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 329 (7th Cir. 2002) ("In most cases, when a district court evaluates the question of whether an employee was meeting an employer's legitimate employment expectations, the issue is not the employee's past performance but 'whether the employee was performing well at the time...' " (citations omitted)). Secondly, Ms. Krukowski fails to identify a similarly situated

employee who received more favorable treatment than her. In order to show that another employee is "similarly situated," a plaintiff must point to someone who is directly comparable to her in all material respects. *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 618 (7th Cir.2000). "[A] court must look at all relevant factors, the number of which depends on the context of the case." *Radue*, 219 F.3d 10 at 617. Such factors include whether the employees had comparable "experience, education and qualifications," provided that the employer took these factors into account when making the personnel decision in question. *Id.* at 618. Ms. Krukowski compares herself to Mr. Bhagat, arguing that they were both executives of Omicron. However, she testified during her deposition, and now concedes, that her primary duty for Omicron was project management. (SUMF Response at p. 4, Nos. 14-18). Also, she worked for Omicron for nine months and was the highest-paid employee, earning $120,000 per year. (SUMF Response at p. 3, No. 10). On the contrary, Mr. Bhagat, is a male who performed technical work for Omicron as an IT technician, he had more than ten years of experience working there, and was paid $1,200 per month as an "independent contractor." (Ex. 6 Bhagat Dep. at p. 10, lines 12-22; p. 12, lines 18-22; p. 13, lines 4-14). The Court finds Ms. Krukowski

and Mr. Bhagat's respective positions within the company far too disparate to be considered similarly situated employees.

As a final attempt to salvage the claim, Ms. Krukowski argues that the reasons Defendants have provided for her termination, the loss of the RFP and the inability to pay her salary, are pretextual, and that she was actually terminated because of her gender. Pretext does not mean mistake or bad judgment; rather, it refers to "a lie, specifically a phony reason for some action." *Wolf v. Buss America, Inc.,* 77 F.3d 914 (7th Cir. 1996) quoting *Russell v. Acme-Evans C*o., 51 F.3d 64, 68 (7th Cir. 1995). Pretext may be established by showing either that, more likely than not, discriminatory intent motivated the employer's decision, or that the employer's proffered explanation is unworthy of credence. *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981); *Sarsha v. Sears, Roebuck & Co*., 3 F.3d 1035, 1039 (7th Cir. 1993). The Court is unable to find any record evidence that might support Omicron's reasoning for termination as illegitimate or pretextual for gender discrimination. Instead, the Court finds that the loss of the major RFP and the resulting inability to maintain Plaintiff's salary to be a valid basis for her termination.

Plaintiff's effort to establish a *prima facie* case of Title VII gender discrimination fails because she cannot demonstrate

13

that she was similarly situated to Mr. Bhagat, nor any other male employee, she fails to prove that she was meeting her legitimate business expectations at the time of her termination, and even if she could establish a *prima facie* case of gender discrimination, she has not provided enough evidence to rebut Omicron's legitimate basis for termination. Therefore, the Court finds that Ms. Krukowski is unable to provide sufficient evidence to meet the requirements the claim entails, and summary judgment is granted in favor of Defendants on Plaintiff's Title VII claim.

## II. Breach of Contract Claim

Defendants next contend that ERISA preempts the Plaintiff's state law-based breach of contract claim for failure to provide health insurance benefits, and that summary judgment should be granted as to this claim, as well. Ms. Krukowski concedes in her response that there are no longer any genuine issues of material fact relating to her breach of contract claim. Instead she suggests that, as a question of law, the Court should either find that the Plan was in existence and that she is preempted, or that the Plan was not in existence and she is not preempted. (Pl.'s Resp. at pp. 20-21). The only evidence before the Court shows that the Plan was in place as of December 15, 2009, the date of Plaintiff's emergency room medical treatment. (SUMF Response at

14

No. 51). Mr. James Dinh, the Aetna representative who negotiated the continued existence of the Plan with Mr. Rabb both in November 2009 and December 2009 - before and after the Plaintiff's December 15, 2009 medical treatment – stated in his deposition that, as of December 15, 2009, Omicron had an employee health insurance plan with Aetna that was in effect. (*Id*.) Plaintiff points to the fact that Defendants failed to pay any portion of policy premiums as they related to the October 31, 2009 to the October 31, 2010 policy period, and that after she received her treatment at Northwestern, Defendants bounced another check in the amount of 22,909.80 on December 31, 2009. (Ex. 8: Dinh Dep. at. 45). Nonetheless, the Court finds that, based on Mr. Dinh's overall testimony and the record evidence, the Plan was in effect.

Ms. Krukowski does not dispute the fact that Omicron had an ERISA plan that was "established and maintained" for ERISA purposes. (SUMF Response No. 49). Moreover, in her claim, she alleges that the breach caused her damages equal to her claimed medical bills. (Complaint at ¶ 78). The existence of the Plan and the fact that this claim seeks damages equal to the Plaintiff's claimed medical benefits means that it is preempted by ERISA.

Indeed, Judge Ashman already found, as a matter of law, that the Plaintiff's ERISA claim preempted her prior fraud and consumer fraud causes of action. (See Court Memorandum Opinion & Order dated March 31, 2011, ECF Doc. #43, at pp. 23-24). In his ruling, Judge Ashman noted that the existence of an ERISA plan was a critical element of these claims and that is why ERISA preemption applied. Similarly here, the existence of an ERISA plan is a critical element of the Plaintiff's breach of contract claim for failure to provide benefits. The Plaintiff's breach of contract claim improperly circumvents ERISA and its broad goals. Further, the Plaintiff has pleaded this count in the alternative, thereby tacitly acknowledging that ERISA preemption applies. Congress intended ERISA to have a broad regulatory effect and this intention calls for preemption.

Plaintiff's arguments against preemption are misplaced. Plaintiff opines that the fact that a defendant is an ERISA Plan administrator does not automatically insulate it from state law liability for alleged wrongdoing against a plan participant or beneficiary. *Trustees of AFTRA Health Fund v. Biondi*, 303 F. 3d 765, 781. (7th Cir. 2002). While that general statement is true, the case law overall is not helpful to Plaintiff's claim, as *AFTRA HealthFund v. Biondi* deals with the preemption of fraud claims, not a breach of contract claim. The Seventh Circuit case

of *Bartholet v. Reishauer*, held that an employee's breach of contract claim was preempted by ERISA because the claim clearly related to ERISA. *Bartholet v. Reishauer*, 953 F.2d 1073 (7th Cir. 1992). The *Biondi* case is factually and procedurally distinct from the instant matter. In finding that ERISA did not preempt that claim, the Seventh Circuit specifically noted that ERISA's broad preemptive effect could not be used to shield a defendant from the consequences of his fraudulent actions. *Id.* In this case, there is no fraud. Plaintiff filed her voluntary motion to dismiss Count III of the Complaint (alleging fraud against the Defendants) and on January 31, 2013, this motion was granted and the fraud claim was dismissed with prejudice. (Plaintiff's Motion to Dismiss Count III, ECF Doc. #173 and Court Order dated Jan. 31, 2013, ECF Doc. #174). Thus, the Plaintiff agrees that there is no fraud here.

As Judge Ashman did before, the Court also concludes that the existence of an ERISA plan is a critical element of the Plaintiff's breach of contract claim. The Court finds that a Plan existed, Plaintiff has already sued the Plan issuer and recovered, and ERISA will preempt herein. Therefore, summary judgment is granted in favor of Defendants on Plaintiff's breach of contract claim.

**III. ERISA Claim**

17

Defendants argue that Plaintiff's entire ERISA claim fails because:(1), the Plan itself is the only proper party to an ERISA claim for denial of benefits under §1132(a)(1)(B), not the Defendants; (2), the Plaintiff has already recovered more money than her claimed benefits and thus, she has already been made whole and she cannot double-recover; and (3), the Plaintiff cannot recover the relief she seeks because a fiduciary duty claim cannot be brought when a denial of benefits one can. Further, Defendants argue that the ERISA claim fails because the Plan itself is not a plaintiff nor is the Plaintiff able to show any damages to the Plan, and since she is not claiming any inability to procure insurance now, her entire ERISA claim is essentially moot because her claimed benefits have already been recovered. (Defs.' Reply p. 16.)

Plaintiff maintains that questions of fact surround Defendants being deemed a fiduciary or not under ERISA. She argues that a person is a fiduciary with respect to a plan to the extent "(i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority

18

or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan." 29 U.S.C. § 1002(21)(A).

A person or entity can become a plan fiduciary by engaging in any of the activities or possessing the discretionary authority, control, or responsibility described in 29 U.S.C. §1002(21)(A). *George v. Kraft Foods Global, Inc.*, 674 F. Supp. 2d 1031, 1049 (N.D. Ill. 2009). Defendants' attempts to downplay the activities and responsibility taken on by Mr. Raab are rejected. Indeed, the record contains an abundance of evidence that could be construed as the actions one with a fiduciary duty would take.

While collecting premiums and transferring funds is ministerial in nature, *see* 29 CFR 1509-8(8), Defendants went beyond that. After learning that the Plan was deficient in payments to Aetna, Mr. Rabb negotiated with Aetna to keep the Plan alive. He and Aetna agreed to a separate payment agreement outside what the Plan documents provided, agreeing that Defendants could pay its past due and future premiums in three installments.

These installment dates and amounts were negotiated by and agreed to by Mr. Rabb on behalf of the Plan. Aetna did not have to agree to such terms per the Plan documents, and Defendants had no

right to coverage at that point.  But, Mr. Rabb's personal

negotiation with Aetna kept the Plan alive.  Such actions by Mr.

Rabb were discretionary and could be seen as exercising control.

A genuine issue of fact surrounds whether once Mr. Rabb made

the discretionary decision to make certain promises

on behalf of the Plan, he then became a fiduciary with respect to

those promises and had a duty to keep them per his signed

contract with Aetna.  Ms. Krukowski argues that, once Defendants

mailed those payments to Aetna on behalf of the Plan, they had a

fiduciary duty to have enough funds in the account to cover those

payments.  Defendants argue that Plaintiff's fiduciary claim

cannot stand based largely on Plaintiff's incorrect formalistic

steps in forming the claim, as well as the fact that she has

already recovered from Aetna a settlement payment in excess of

the ERISA damages she seeks.  These are issues of fact that are

ripe for analysis and cannot be dismissed on summary judgment.

Therefore, Defendants' motion for summary judgment on Plaintiff's

ERISA claim is denied.


## IV.  Conclusion

For the reasons set forth above, Defendants' motion for

summary judgment [188] is granted in part and denied in part.  As

to the Title VII and breach of contract claim, the motion for

summary judgment is granted.  Regarding the ERISA claim, however, the Court finds that genuine issues of material fact exist. Therefore, Defendants' motion as to the ERISA claim is denied.

Date: July 26, 2013


E N T E R E D:

_____
MAGISTRATE JUDGE ARLANDER KEYS
UNITED STATES DISTRICT COURT